CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

MAR 08 2024

LAURA A. AUSTIN, CLERK
BY: s/ H. MCDONALD
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF VIRGINIA (DANVILLE DIVISION)

NANCY LARISSA DEEDRICH,

      *Plaintiff,*

    **v.**

**DANVILLE REDEVELOPMENT & HOUSING AUTHORITY**,

      *Defendant.*

)
)
)
)
)
)
)
)
)
)

Case No.: 4:24CV00008

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff, Nancy Larissa Deedrich ("Plaintiff" or "Ms. Deedrich"), brings this complaint seeking damages against Defendant, Danville Redevelopment & Housing Authority ("Defendant") or ("DRHA"), for retaliating against her for opposing fraud against the federal government and the Commonwealth of Virginia and for breach of contract. In support thereof, Plaintiff states as follows:

## I. JURISDICTION AND VENUE

1. This action arises under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 et seq., Virginia's anti-retaliation statute, Va. Code Ann. § 40.1-27.3, The Virginia Wage Payment Act, Va. Code Ann. § 40.1-29, and the common law of Virginia. This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331 in that this action arises under the laws of the United States.

2. Venue is proper in the United States District Court for the Western District of Virginia pursuant to 28 U.S.C. §§ 1391(b) and (c) because the acts underlying this action occurred in the Western District of Virginia and 31 U.S.C. § 3732(a) because the Defendant transacts business within this district.

## II.  THE PARTIES

3.      Plaintiff **Larissa Deedrich** is a citizen and resident of the United States and South Dakota.

4.      Plaintiff is the former Director of the Danville Redevelopment & Housing Authority who held that position between April 1, 2020, and January 2024.

5.      Plaintiff was retaliated against after reporting a DRHA officer had submitted a fraudulent invoice for payment on behalf of her sister (who was not eligible to receive payments because she was a non-citizen who entered the country illegally) to obtain $6,959.52 and disguising that payment by creating a North Carolina LLC to which payment was issued.

6.      Plaintiff reported that fraudulent payment to the DRHA Board of Commissioners ("the Board") and alerted it that the officer had claimed she was untouchable because she was having a romantic relationship with the Board's Chairman, Mayor Alonzo Jones.

7.      In response, the Board rescinded a previously promised pay increase and indicated through its attorneys that Plaintiff's report of these facts would be the "last straw."

8.      Defendant **Danville Redevelopment & Housing Authority** is a public entity created to provide federally-subsidized housing to people living in the greater Danville area.

9.      The DRHA is governed by a seven-person board of commissioners appointed by the City of Danville.

10.     DRHA owns and manages a total of 577 units in seven multi-family developments serving approximately 1,600 residents and administers approximately 1,700 Housing Choice Voucher units in Danville, Martinsville, Pittsylvania County, and Henry County.

11.     DRHA is primarily funded by the United States Department of Housing and Urban Development ("HUD").

## III.   LEGAL FRAMEWORK

### A.   FCA's Anti-retaliation Statute, 31 U.S.C. § 3730(h)

12.     The False Claims Act's anti-retaliation statute, 31 U.S.C. § 3730(h), allows an employee, contractor, or agent of an employer to obtain "all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter."  31 U.S.C. § 3730(h)(1) (emphasis added).

13.     "[T]he scope of protected activity under the FCA should be interpreted broadly." Patel v. Va. Premier Health Plan, Inc., 2022 U.S. Dist. LEXIS 118575, *11 (W.D. Va. 2022).

14.     In 2010, 31 U.S.C. § 3730(h) was expanded to add the "other efforts" language.

15.     Under the new standard, "an act constitutes protected activity where it is motivated by an objectively reasonable belief that the employer is violating, or soon will violate, the FCA. United States ex rel. Grant v. United Airlines Inc., 912 F.3d 190, 201 (4th Cir. 2018).

16.     "A belief is objectively reasonable when the plaintiff alleges facts sufficient to show that he believed his employer was violating the FCA, that this belief was reasonable, that  [s]he took action based on that belief, and that h[er] actions were designed to stop one or more violations of the FCA"  Id. at 201-202.

17.     Affected employees are entitled to reinstatement, "2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees."  31 U.S.C. § 3730(h)(2).

18.     Employees have up to three years from the date on which the retaliation occurred to file suit.  31 U.S.C. § 3730(h)(3).

19.     "[R]etaliation claims under § 3730(h) are not subject to Rule 9(b)'s heightened particularity requirement. Instead, a plaintiff need only satisfy Rule 8(a)'s notice-pleading standard." Id. at 200.

**B.  Virginia Anti-retaliation Statute, Va. Code Ann. § 40.1-27.3.**

20.     Under Va. Code § 40.1-27.3, "[a]n employer shall not discharge, discipline, threaten, discriminate against, or penalize an employee, or take other retaliatory action regarding an employee's compensation, terms, conditions, location, or privileges of employment, because the employee: [o]r a person acting on behalf of the employee in good faith reports a violation of any federal or state law or regulation to a supervisor … [or] [r]efuses to engage in a criminal act that would subject the employee to criminal liability."

21.     "A person who alleges a violation of this section may bring a civil action in a court of competent jurisdiction within one year of the employer's prohibited retaliatory action."  Va. Code § 40.1-27.3(C).

22.     "The court may order as a remedy to the employee (i) an injunction to restrain continued violation of this section, (ii) the reinstatement of the employee to the same position held before the retaliatory action or to an equivalent position, and (iii) compensation for lost wages, benefits, and other remuneration, together with interest thereon, as well as reasonable attorney fees and costs." Id.

**C.  Breach of Contract**

23.     An employment contract is valid and enforceable in Virginia if the elements of offer, acceptance, and consideration are satisfied.

24.     A party who fails to comply with the terms of the contract without justification is deemed to be in breach of that contract.

25.     The non-breaching party may file suit to collect the damages produced by that breach within five (5) years if the contract is in writing or three (3) years if the contract is oral.

**D.  Virginia Wage Payment Act, Va. Code Ann. § 40.1-29**

26.     Under Va. Code § 40.1-29(C), "No employer shall withhold any part of the wages or salaries of any employee except for payroll, wage or withholding taxes or in accordance with law, without the written and signed authorization of the employee.

27.     Under Va. Code Ann. § 40.1-29(A), "Upon termination of employment an employee shall be paid all wages or salaries due him for work performed prior thereto; such payment shall be made on or before the date on which he would have been paid for such work had his employment not been terminated." (Emphasis added.)

28.     Under Va. Code Ann. § 40.1-29(J), "if an employer fails to pay wages to an employee in accordance with this section or § 40.1-29.2, the employee may bring an action, individually … against the employer in a court of competent jurisdiction to recover payment of the wages, and the court shall award the wages owed, an additional equal amount as liquidated damages, plus prejudgment interest thereon as provided in subsection G [8%], and reasonable attorney fees and costs." (Emphasis added.)

29.     "If the court finds that the employer knowingly failed to pay wages to an employee in accordance with this section or § 40.1-29.2, the court shall award the employee an amount equal to triple the amount of wages due and reasonable attorney fees and costs." Id. (emphasis added).

30.     "[A] person acts 'knowingly' if the person, with respect to information, (i) has actual knowledge of the information, (ii) acts in deliberate ignorance of the truth or falsity of the

information, or (iii) acts in reckless disregard of the truth or falsity of the information." Va. Code Ann. § 40.1-29(J).

31.    "Establishing that a person acted knowingly shall not require proof of specific intent to defraud." Va. Code Ann. § 40.1-29(J).

**E.  Commonwealth of Virginia Criminal Statutes**

32.    Under <u>Va. Code Ann. § 18.2-95</u>, "[a]ny person who …  commits simple larceny not from the person of another of goods and chattels of the value of $1,000 or more … shall be guilty of grand larceny, punishable by imprisonment in a state correctional facility for not less than one nor more than 20 years or, in the discretion of the jury or court trying the case without a jury, be confined in jail for a period not exceeding 12 months or fined not more than $2,500, either or both."

33.    Under <u>Va. Code § 18.2-111</u>, "If any person wrongfully and fraudulently use, dispose of, conceal or embezzle any money … which he shall have received for another or for his employer, principal or bailor, or by virtue of his office, trust, or employment, or which shall have been entrusted or delivered to him by another or by any court, corporation or company, he shall be guilty of embezzlement."

34.    "Proof of embezzlement shall be sufficient to sustain the charge of larceny. Any person convicted hereunder shall be deemed guilty of larceny and may be indicted as for larceny and upon conviction shall be punished as provided in § 18.2-95 or § 18.2-96." <u>Id.</u>

35.    Under <u>Va. Code Ann. § 18.2-112</u>, "If any officer, agent or employee of the Commonwealth or of any city, town, county, or any other political subdivision, or the deputy of any such officer having custody of public funds, or other funds coming into his custody under his official capacity, knowingly misuse or misappropriate the same or knowingly dispose thereof

otherwise than in accordance with law, he shall be guilty of a Class 4 felony; and any default of such officer, agent, employee or deputy in paying over any such funds to the proper authorities when required by law to do so shall be deemed prima facie evidence of his guilt."

36.     Under Va. Code Ann. § 18.2-22, "If any person shall conspire, confederate or combine with another, either within or outside the Commonwealth, to commit a felony within the Commonwealth, or if he shall so conspire, confederate or combine with another within the Commonwealth to commit a felony either within or outside the Commonwealth, he shall be guilty of a felony that shall be punishable as follows:

(1) Every person who so conspires to commit an offense that is punishable as a Class 1 felony is guilty of a Class 3 felony;

(2) Every person who so conspires to commit an offense that is any other felony is guilty of a Class 5 felony; and

(3) Every person who so conspires to commit an offense the maximum punishment for which is confinement in a state correctional facility for a period of less than five years shall be confined in a state correctional facility for a period of one year, or, in the discretion of the jury or the court trying the case without a jury, may be confined in jail not exceeding 12 months and fined not exceeding $500, either or both.

(b) However, in no event shall the punishment for a conspiracy to commit an offense exceed the maximum punishment for the commission of the offense itself.

37.     Under Va. Code Ann. § 18.2-498.3, "Any person, in any commercial dealing in any matter within the jurisdiction of any department or agency of the Commonwealth of Virginia, or any local government within the Commonwealth or any department or agency thereof, who knowingly falsifies, conceals, misleads, or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be guilty of a Class 6 felony.

38.     "Commercial dealing" is defined as "any offer, acceptance, agreement, or solicitation to sell or offer to sell or distribute goods, services or construction, to the Commonwealth of Virginia, or any local government within the Commonwealth or any department or agency thereof."  Va. Code Ann. § 18.2-498.2 (emphasis added).

### F.  Virginia's Common Law *Bowman* Claim

39.     Under Virginia common law, "A terminated employee may bring a Bowman claim that asserts 'a wrongful discharge . . . in violation of public policy[.]'" Carter v. Hunt, 83 Va. Cir. 265, 266 (Franklin County 2011) (quoting McFarland v. Virginia Ret. Servs. of Chesterfield, 477 F. Supp. 2d 727, 733 (E.D. Va. 2007)).

40.     "To prevail, the plaintiff must show (1) that the statute in question either contains an express statement of public policy or is designed to protect the rights or welfare of the general public …." Carter, 83 Va. Cir. 266.

41.     "[C]riminal statutes were enacted for the protection of the general public …." Mitchem v. Counts, 259 Va. 179, 189 (2000).

42.     The employee must also prove "that the plaintiff was fired for exercising a right the statute is meant to protect."  Id. (citing Shaw v. Titan Corp., 255 Va. 535, 543 (1998).

43.     Establishing an employee had a statutory duty is viewed "the same as an employee's statutory right" for purposes of analyzing *Bowman* liability.  McClosky v. Warren Co. Dep't of Soc. Servs., 81 Va. Cir. 35, 37 (Warren County 2010).

44.     Under Virginia law, terminating an employee for internally complaining about violations of state law is a recognized *Bowman* claim.  See, e.g., Frank v. True Color Painters, LLC, 108 Va. Cir. 490, 492 (Fairfax County 2021).

45.    An employee who is constructively discharged by her employer is able to maintain a Bowman claim even though the employee resigned her position.  <u>Briggman v. Nexus Servs.</u>, 2018 U.S. Dist. LEXIS 209212, *13 (W.D. Va. 2018).

46.    An employee alleging a valid *Bowman* claim is entitled to both compensatory and punitive damages.

## IV.  STATEMENT OF FACTS

### A.  DRHA Funding Sources

47.    DRHA is funded via grants from the United States Department of Housing and Urban Department ("HUD").  (<u>See</u>, <u>e.g.</u>, **Exhibit 1**.)

48.    All DRHA Capital Fund Operating Account monies are derived from HUD.

### B.  Katya Urraco, DRHA's Chief Financial Officer, Claims to Have a Romantic Relationship With Her Boss, Mayor Alonzo Jones

49.    DRHA hired Katya Urraco ("Katya") as its Chief Financial Officer in March 2021.

50.    In November 2022, Katya began bragging to co-workers that she was having a romantic relationship with Danville's Mayor, Alonzo Jones.

51.    Mayor Jones is a member of DRHA's Board that sets her salary, approves raises and promotions, and has ultimate authority of which individuals are hired or fired.

52.    Katya showed Plaintiff text messages she had exchanged with Mayor Jones that were clearly romantic in nature.

53.    Following Katya's announcement she was in a romantic relationship with Mayor Jones, Katya became increasingly distracted from her job duties, allowing projects to go undone and the balance in the operating account to get so low that checks were being dishonored and returned due to insufficient funds,

**C.  Katya's Sister, Isabella Urraco, Creates a Foreign LLC – Blu Malachite LLC**

54.     Katya's sister, Isabella Urraco ("Isabella"), performed services as an unpaid intern for DRHA in the summer of 2021 and 2022.

55.     Isabella was not eligible to receive payment from DRHA because she lacks legal status as a result of entering the country illegally.

56.     In 2023, Isabella again interned for DRHA as an unpaid summer intern.

57.     To circumvent the prohibition on making payments to undocumented immigrants, Katya instructed Isabella to create an LLC to whom DRHA would make payment.

58.     On August 9, 2023, Isabella created a North Carolina LLC named Blu Malachite, LLC.

59.     Isabella listed herself as the registered agent for this LLC and used her home address as the address of the LLC.  (See **Exhibit 2**.)  This was also Katya's home address.

60.     On August 11, 2023, Katya created a fraudulent invoice drawn on DRHA's Capital Fund Operating Account in the amount of $6,959.52 made payable to Blu Malachite, LLC.

61.     On August 25, 2023, Katya processed and paid the $6,959.52 invoice to Blu Malachite LLC using check number 14476.

**D.  Plaintiff Confronts Katya About Bounced Checks; Katya Enlists Mayor's Help in Attacking Plaintiff**

62.     On September 6, 2023, Plaintiff learned about multiple overdraft charges DRHA had incurred at American National Bank.

63.     Employees even received cancellation notices for employee benefits due to nonpayment of premiums.

64.     Plaintiff confronted Katya about why she had failed to keep enough money in this account to pay DRHA's expenses.

65.     On September 22, 2023, Katya e-mailed Mayor Jones, a DRHA Board member and her professed paramour, to complain that she believed Plaintiff had authorized a contract without having gone through the proper channels.

**E.  DRHA Board Approves Raise, 2-Year Contract Extension for Plaintiff**

66.     On September 12, 2023, Plaintiff had met with DRHA's Executive Committee (Amanda Oakes & Vanessa Cain) to discuss her requested 2-year contract extension and annual salary of $175,000.

67.     Ms. Oakes and Ms. Cain agreed this was fair and stated they would recommend it in closed session at the September Board meeting.

68.     On September 26, 2023, Ms. Oakes presented Plaintiff's request for a 2-year extension and $175,000 salary at the Board of Commissioner's meeting.

69.     The Board went into closed session with Plaintiff present.

70.     They discussed and approved Plaintiff's requested raise and 2-year contract extension.

71.     The Board approved the raise and contract extension and stated it would take effect October 1, 2023 (5 days later).

72.     On September 27, 2023, Plaintiff e-mailed the Board of Commissioners thanking them for approving her raise and extension.

**F.  Plaintiff Discovers and Reports the Fraudulent Invoice to DRHA's Attorneys**

73.     On October 17, 2023, Plaintiff heard a rumor from a DRHA employee that Katya had paid her sister Isabella for doing summer intern work and had created a "corporation" to enable DRHA to pay her because Isabella was an "illegal alien."

74.     When Plaintiff learned this information, she investigated the information provided and found the fraudulent invoice and the North Carolina LLC in Isabella's name.

75.     Plaintiff immediately informed DRHA's attorney, Mark Loftis, about what she had learned.

76.     At Mr. Loftis's request, Plaintiff supplied evidence to Mr. Loftis and fellow attorney, Victor Cardwell.

**G.  DRHA Retaliates Against Plaintiff by Indefinitely Postponing Her Promised Raise and Contract Extension and Accusing Plaintiff of Wrongdoing**

77.     On October 19, 2023, Amanda Oakes texted Plaintiff and requested to meet with her, Vanessa, and Mark.

78.     Plaintiff assumed the meeting was called be to discuss Katya's theft of federal government funds.

79.     When Plaintiff arrived at the meeting, however, Mr. Loftis informed Plaintiff she had a right to seek her own legal counsel.

80.     Plaintiff indicated she did not need legal counsel and asked what the Board was planning to do about Katya's illegal behavior.

81.     In response, Mr. Loftis asked if Plaintiff had lied about anything regarding Katya.

82.     Plaintiff confirmed she had been 100% honest and did not understand why she was the one being accused of dishonesty.

83.     Ms. Oakes then stated the Board would not honor Plaintiff's promised raise and 2-year extension.

84.     Mr. Loftis reiterated that he represented DRHA, not Plaintiff, and suggested Plaintiff could face legal trouble for unspecified violations of DRHA policy.

85.     All of these retaliatory actions occurred **two days** after Plaintiff reported that DRHA's Chief Financial Officer (and Mayor Jones's girlfriend) had misappropriated federal funds and paid them to her sister, an undocumented alien.

86.     On October 20, 2023, Plaintiff e-mailed Mr. Loftis and Mr. Cardwell for legal advice regarding the theft of funds and asked to discuss how to raise this concern in the next Board Meeting.

87.     On October 23, 2023 (the next business day), after receiving no response to this request, Plaintiff sent an e-mail addressed to all Board members alerting them to the allegations being directed at Plaintiff and documentation supporting Plaintiff's allegation that Katya had misappropriated federal funds from DRHA.

88.     In response, Mayor Jones immediately called Plaintiff and asked if there was any way Plaintiff could work with Katya **so "you can both keep your jobs**."

89.     Plaintiff responded to Mayor Jones that she did not feel that was an option at this point.

90.     The next day, October 24, 2023, DRHA held its next Board Meeting.

91.     At the meeting, Plaintiff asked Mr. Loftis if there were plans to discuss Katya's unlawful behavior during the Closed Session.

92.     In response, Mr. Loftis shrugged his shoulders and would not speak, however Katya and Mr. Loftis whispered to each other throughout the regular meeting.

93.     When the Board announced its decision to enter closed session, Plaintiff was asked to leave.

94.     Ms. Oakes told Plaintiff that she would come to Plaintiff's office to get her when the Commissioners were ready to talk.

95.   When the meeting ended, no one came to get Plaintiff.

96.   Plaintiff saw Ms. Oakes and asked her what the Board had decided.

97.   Ms. Oakes said the Board would meet again next week so the Commissioners could question Plaintiff.

98.   Plaintiff told Ms. Oakes and Commissioner Pat Daniel she felt this was feeling very one-sided and began when she informed them about Katya's unlawful behavior.

99.   In response, Mr. Daniel stated Plaintiff needed to "try and deal with it."

100.   On October 25, 2023, Plaintiff sent an e-mail to DRHA's attorney, Mr. Loftis, indicating that the harassment she was being subjected to was making it "nearly impossible to operate an agency and continue to work under duress."  (**Exhibit 3**, at 2.)

101.   Plaintiff attached a letter to this e-mail alleging "illegal workplace retaliation" that began soon after she "discovered evidence of the federal embezzlement of funds committed by Ms. Urraco and fraud against the agency by misappropriation of federal funds."  (**Exhibit 4**.)

102.    Plaintiff reminded the Board she had "raised this concern to DRHA's legal counsel as well as the Board of Commissioners" and DRHA retaliated against her by refusing to honor her new contract and by engaging in a whisper campaign against her that undermined her standing with her subordinates, causing "immense and undue emotional distress."  Id.

103.   This emotional distress has manifested itself in the form of anxiety, restless sleep, hair loss, a stomach ulcer, increased blood pressure, and complications with a pre-existing medical condition that was aggravated by the stress produced by Defendant's actions.

104.   Mr. Loftis forwarded the e-mail and attached letter to his firm's managing partner, Victor Cardwell, who also represents DRHA.

105.     After DRHA's attorneys discussed Plaintiff's allegations, Mr. Loftis stated, "some of the Board was ready to fire her last night and **this is going to be the last straw**."  (**Exhibit 3**, at 1.)

106.     On November 14, 2023, the Board met in closed, Executive Session to discuss Plaintiff's employment.

107.     Mr. Loftis refused to allow Plaintiff to participate, allegedly because she had retained an attorney.

108.     Plaintiff asked the Board if they were going to discuss honoring her promised raise and contract extension, to which Chairman Oakes responded, "Not at this time."

109.     Days later, Katya resigned, which upset Mayor Jones even more, prompting additional rumors that Plaintiff's job was in jeopardy.

110.     On December 4, 2023, after DRHA had delayed honoring its promise to extend Plaintiff's contract or increase her salary, Plaintiff's counsel contacted DRHA's counsel, Victor Cardwell, to discuss the status of Plaintiff's employment.

111.     Later that evening, the DRHA Board met with Plaintiff and asked her to sign a "Corrective Action Memorandum" ("1st Memorandum").

112.     The 1st Memorandum listed activities it described as "Procurement Process Irregularities" which, while not illegal or against DRHA policy, DRHA alleged were "highly unusual."

113.     The 1st Memorandum further blamed Plaintiff for not discovering Katya's unlawful and unprofessional actions more quickly because "the Chief Financial Officer reports to you …."

114.    The 1st Memorandum stated, "The Board of Commissioners will be tabling any proposed salary increase, and any proposed extension of the term of your contract, until the end of the current contract term."

115.    While the 1st Memorandum referred to the raise and contract extension as "proposed," the Board had already approved those terms which were supposed to have gone into effect on October 1, 2023.

116.    Plaintiff refused to sign the 1st Amendment, noting that several allegations contained therein were false.

117.    On December 11, 2023, Chairman Oakes e-mailed Plaintiff a revised "Corrective Action Memorandum" ("2nd Memorandum"), which was dated the following day.

**H.   DRHA Fails to Pay Plaintiff All Unused PTO at Resignation, in Violation of Her Contract and Established Policy**

118.    Because the Board refused to honor its promise to extend her contract (which was expiring soon) and was creating a "trap-door" paper trail to justify terminating her, Plaintiff requested – and DRHA agreed – to allow Plaintiff to use PTO on days when she was scheduled to work.

119.    On December 21, 2023, Plaintiff began using some of her accrued 359 hours of PTO.

120.    Plaintiff used PTO on December 21 and 22, was off December 23 and 24 (weekend), was off December 25 and 26 (Christmas holiday), used Comp time for December 27-29 (per DRHA policy), was off December 30 and 31 (weekend), was off January 1-2 (New Years holiday), used PTO on January 3-5, and was off January 6 (weekend).

121.    This represents a total of five days (40 hours) of PTO used during this period, resulting in a balance of 319 hours of unused PTO.

122.    Despite being on PTO between January 3-5, Plaintiff approved checks and assisted DRHA employees access grant reports and bank accounts.

123.    On January 7, 2024, because DRHA clearly signaled she had no job security and would likely be terminated at the end of contract, Plaintiff resigned to accept a position in another state.

124.    As a result, she incurred thousands of dollars in moving and relocation expenses and was forced to rent a home in her new location while her house in Virginia is being marketed for sale.

125.    On January 22, 2024, Plaintiff received her final paycheck.

126.    Despite being owed $28,726.70 for the remaining PTO she had accrued, DRHA failed or refused to include any of these wages in Plaintiff's paycheck.

127.    Plaintiff's counsel notified DRHA's counsel of this violation, calculated the number of hours to which Plaintiff was entitled, and asked DRHA to include that payment in the next paycheck being issued in early February.

128.    Despite this request, DRHA again failed or refused to pay Plaintiff any of the $28,726.70 she had earned in unused PTO and has yet to do so.

## Count I
### FCA Retaliation, 31 U.S.C. § 3730(h)

129.    Paragraphs 1 through 128 are incorporated by reference as if fully restated in this Count I.

130.    Plaintiff engaged in protected activity when she reported that Katya and her sister, Isabella, had conspired to embezzle and ultimately did embezzle funds provided by HUD to operate DRHA.

131.    At all relevant times, Katya was an agent of DRHA and its Chief Financial Officer.

132.    Plaintiff reported these criminal acts in good faith to DRHA's attorneys and directly to DRHA Board members in order to stop 1 or more violations of the False Claims Act.

133.    As a result of Plaintiff's efforts to oppose violations of the False Claims Act, DRHA retaliated against Plaintiff in the terms and conditions of her employment.

134.    As a result of DRHA's unlawful retaliation, Plaintiff suffered lost income, loss of professional standing and reputation, emotional distress, and other damages to be proven at trial.

135.    Plaintiff is entitled to liquidated (double) damages resulting from DRHA's violation of 31 U.S.C. § 3730(h).

### Count II
### Virginia Anti-retaliation Statute, Va. Code Ann. § 40.1-27.3.

136.    Paragraphs 1 through 135 are incorporated by reference as if fully restated in this Count II.

137.    Plaintiff reported in good faith violations of state and federal statutes to her supervisor and DRHA, a governmental body.

138.    Because Plaintiff reported this unlawful activity, DRHA retaliated against Plaintiff in the terms and conditions of her employment.

139.    As a result of DRHA's unlawful retaliation, Plaintiff suffered lost income, loss of professional standing and reputation, emotional distress, and other damages to be proven at trial.

### Count III
### Breach of Contract

140.    Paragraphs 1 through 139 are incorporated by reference as if fully restated in this Count III.

141.    Plaintiff offered to continue working for DRHA at a rate of $175,000 per year beginning October 1, 2023, for a period of two years.

142.    VRHA, through its agents, accepted this offer and communicated that acceptance to Plaintiff.

143.    Plaintiff's agreement to perform labor exclusively for DRHA and DRHA's agreement to pay Plaintiff and extend her contract provided the consideration for this contract ("the Extension").

144.    Plaintiff honored her contractual obligations by continuing to work for Plaintiff during the first few months of the Extension.

145.    Despite Plaintiff's performance, DRHA failed or refused to honor its obligations under the Extension.

146.    As a direct and proximate result of DRHA's breach of the terms in the Extension, Plaintiff suffered $5,990.38 in lost wages and job insecurity as DRHA's refusal to honor the Extension terms left her fearful DRHA would terminate her on the date her contract would have expired prior to accepting the Extension.

147.    DRHA also promised to pay Plaintiff all unused PTO in her final paycheck.

148.    DRHA failed to pay Plaintiff any PTO in her final paycheck.

149.    Even after being reminded of its contractual obligations, DRHA failed or refused to pay Plaintiff any PTO in the next paycheck issued to employees nearly a month after she resigned from DRHA.

150.    As a direct and proximate result of DRHA's breach of its promise to pay Plaintiff the unused PTO wages she had earned in her final paycheck, Plaintiff suffered lost wages in the amount of $28,726.70.

## Count IV
### Virginia Wage Payment Act, Va. Code Ann. § 40.1-29

151.    Paragraphs 1 through 150 are incorporated by reference as if fully restated in this Count IV.

152.    The payment DRHA was required to pay Plaintiff for unused PTO represented "wages" for purposes of Va. Code Ann. § 40.1-29.  (See **Exhibit 5**) (reflecting "P.T.O." as "Earnings" on Plaintiff's paycheck from DRHA.

153.    DRHA was required to pay Plaintiff all wages she had earned (including the $28,726.70 in PTO wages and $5,990.38 in diminished wages) on or before the date Plaintiff received her final paycheck.

154.    DRHA failed to pay Plaintiff any of these withheld wages in her final paycheck, nor in the next paycheck issued to DRHA employees, even after DRHA was reminded of this obligation.

155.    Under Va. Code Ann. § 40.1-29(J), "if an employer fails to pay wages to an employee in accordance with this section or § 40.1-29.2, the employee may bring an action, individually … against the employer in a court of competent jurisdiction to recover payment of the wages, and the court shall award the wages owed, an additional equal amount as liquidated damages, plus prejudgment interest thereon as provided in subsection G [8%], and reasonable attorney fees and costs." (Emphasis added.)

156.    DRHA acted knowingly because it had actual knowledge of the information (that Plaintiff had accrued unused PTO and that DRHA was obligated to pay her those wages in her final paycheck), acted in deliberate ignorance of the truth or falsity of the information, or acted in reckless disregard of the truth or falsity of the information."

157.    Because DRHA "knowingly failed to pay wages to [Plaintiff] in accordance with this section or § 40.1-29.2, the court shall award the employee an amount equal to triple the amount of wages due and reasonable attorney fees and costs." Id. (emphasis added).

158.    Thus, Plaintiff is entitled to triple the amount of wages withheld ($104,151.24, representing 3*$34,717.08), plus 8% pre-judgment interest on that sum, in addition to attorney fees and costs she incurs pursuing this cause of action.

### Count V
### Virginia's Common Law *Bowman* Claim

159.    Paragraphs 1 through 158 are incorporated by reference as if fully restated in this Count V.

160.    Plaintiff reported to DRHA in good faith violations of several state statutes, including …

161.    These criminal Virginia statutes express public policy because they were all enacted to protect the general public.

162.    Plaintiff had a duty to report Katya's and Isabella's violations of these criminal Virginia statutes.

163.    As a direct and proximate result of Plaintiff's compliance with her duty to report these criminal violations, DRHA retaliated against Plaintiff and constructively terminated Plaintiff by making her continued employment with DRHA so intolerable she had no choice but to resign.

164.    DRHA constructively terminated Plaintiff because she reported the foregoing criminal violations to DRHA.

165.    As a result of this unlawful termination in violation of Virginia public policy, Plaintiff suffered both compensatory and punitive damages.

## V.  PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests and prays the Court to enter judgment in her favor and against VRHA as follows:

A.      Declare that DRHA violated the False Claims Act by retaliating against Plaintiff;

B.      Declare that DRHA violated Va. Code Ann. § 40.1-27.3 by retaliating against Plaintiff;

C.      Declare that DRHA violated Va. Code Ann. § 40.1-29 by withholding wages from Plaintiff's last paycheck;

D.      Order DRHA to pay Plaintiff two times the amount of back pay she lost by virtue of being retaliated against for reporting violations of the False Claims Act, compensatory damages for emotional distress Plaintiff suffered as a result of DRHA's retaliation against her, and pre-judgment interest;

E.      Order DRHA to pay Plaintiff all income she lost and all emotional distress she suffered, as a result of being retaliated against for reporting violations of state and federal statutes, plus pre-judgment interest;

F.      Order DRHA to pay Plaintiff $33,400 for breaching its contract with Plaintiff by failing to pay her the unused PTO she had earned prior to the end of her employment with DRHA;

G.      Order DRHA to pay Plaintiff $5,990.38 for breaching its contract with Plaintiff by failing to pay her at the $175,000 annual rate it had agreed to pay Plaintiff beginning October 1, 2023, until January 7, 2024.

H.      Order DRHA to pay Plaintiff $104,151.24 (representing 3*$34,717.08), plus 8% pre-judgment interest for withholding Plaintiff's wages in violation of Va. Code Ann. § 40.1-29;

I.       Order DRHA to pay Plaintiff all compensatory damages she suffered as a result of her unlawful termination, plus $350,000 in punitive damages;

J.       Order DRHA to pay Plaintiff post-judgment interest on all amounts awarded;

K.       Order DRHA to reimburse Plaintiff for all reasonable attorney fees and costs she incurs pursuing a remedy under 31 U.S.C. § 3730(h)(2), Va. Code Ann. § 27.3, and Va. Code Ann. § 29); and

L.       Award Plaintiff all other available and appropriate statutory, legal, nominal, injunctive and equitable relief.

**PLAINTIFF DEMANDS A JURY ON ALL ISSUES SO TRIABLE.**

March 8, 2024

NANCY LARISSA DEEDRICH

By:  */s/ Christopher E. Collins*
        Christopher E. Collins
        *Counsel for Plaintiff*

Christopher E. Collins (VSB No. 90632)
Mia Yugo (VSB No. 92975)
**YUGO COLLINS, PLLC**
25 Franklin Rd. SW
Roanoke, Virginia 24011
Tel: (540) 861-1529
Direct: (540) 855-4791
Chris@YugoCollins.com
Mia@YugoCollins.com

*Counsel for Plaintiff*