CLERKS OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED
April 30, 2025
LAURA A. AUSTIN, CLERK
BY: s/ FELICIA CLARK
    DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# DANVILLE DIVISION

| | |
|---|---|
| **NANCY LARISSA DEEDRICH,** | ) |
| Plaintiff, | ) Case No. 4:24CV00008 |
| v. | ) **OPINION AND ORDER** |
| **DANVILLE REDEVELOPMENT & HOUSING AUTHORITY,** | ) JUDGE JAMES P. JONES |
| Defendant. | ) |

*Christopher E. Collins*, YUGO COLLINS, PLLC, Roanoke, Virginia, for Plaintiff; *Jonathan W. Gonzalez*, GORDON REES SCULLY MANSUKHANI, LLP, Williamsburg, Virginia, for Defendant.

Plaintiff Nancy Larissa Deedrich brings this action against her former employer, Danville Redevelopment & Housing Authority (Housing Authority), alleging that that it unlawfully retaliated against her, failed to sufficiently pay her, and constructively discharged her. Deedrich's claims arise under the False Claims Act, 31 U.S.C. § 3730(h), Virginia's anti-retaliation statute, Va. Code Ann. § 40.1-27.3, the Virginia Wage Payment Act, Va. Code Ann. § 40.1-29, and Virginia's *Bowman* doctrine. The Housing Authority has moved to dismiss the Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). For the reasons that follow, the Motion to Dismiss will be granted in part and denied in part.

I.  BACKGROUND.

The following facts are alleged in Deedrich's Complaint and must be taken as true for the purposes of this Motion to Dismiss.

Deedrich was employed as the Director of the Housing Authority from April 1, 2020, to January 2024.  In March 2021, Katya Urraco (Katya) was hired as the Housing Authority's Chief Financial Officer and later became romantically involved with the City of Danville's Mayor, Alonzo Jones, also the Chairman of the Housing Authority's Board of Commissioners (Board) Katya's sister, Isabella Urraco (Isabella) worked for the Housing Authority as an intern during the summers of 2021, 2022, and 2023.  Isabella was unable to receive any payments from the Housing Authority due to her status as an undocumented immigrant.

On August 9, 2023, Isabella created a North Carolina LLC.  Katya then created an invoice for $6,959.52 on the Housing Authority's Capital Fund Operating Account and paid that money to Isabella's LLC on August 25, 2023.  Although Deedrich had not yet learned about the LLC's existence, she learned about overdraft charges that the Housing Authority had incurred and confronted Katya about them. Katya subsequently emailed Chairman Jones alleging that Deedrich had authorized a contract without going through proper procedures.

In the midst of this, Deedrich was negotiating her employment contract.  On September 12, 2023, Deedrich met with the Housing Authority's Executive

Committee to discuss her request for a raise and a two-year contract extension. On September 26, 2023, a closed session of the Board approved Deedrich's request and told her that it would take effect on October 1, 2023.

On October 17, 2023, Deedrich heard a rumor that Katya had made a payment to an LLC to circumvent restrictions on paying her undocumented sister. Deedrich investigated and discovered both the invoice and the LLC registered to Isabella. Deedrich informed the Housing Authority's attorney of her discovery. Two days later, Deedrich was called into a meeting with the attorney and the Executive Committee. During the meeting, Deedrich was told that the Board did not plan to implement Deedrich's new contract terms and that she might face legal problems for violations of Housing Authority policy.

On December 4, 2023, Deedrich's counsel contacted the Housing Authority's counsel to discuss Deedrich's employment. That evening, the Board asked Deedrich to sign a memorandum outlining activities described as "Procurement Process Irregularities" and informing Deedrich that the Board would not consider her raise or contract extension until the end of her contract term. Deedrich refused to sign the memorandum, believing it would be used to fire her.

Due to her severe physical and emotional distress over these circumstances, Deedrich resigned from her position at the Housing Authority. The Housing

Authority refused to pay her for accrued benefits she was owed under the terms of her extended contract.

## II.  STANDARD OF REVIEW.

Subject-matter jurisdiction challenges under Rule 12(b)(1) often proceed in one of two ways: either a facial challenge, asserting that the allegations pleaded in the complaint are insufficient to establish subject matter jurisdiction, or a factual challenge, asserting "that the jurisdictional allegations of the complaint [are] not true." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009).  In this case, the parties have not contested the underlying facts as to jurisdiction and instead solely rely upon case authority.

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a complaint to determine whether the plaintiff has properly stated a claim, but "it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). In considering a Rule 12(b)(6) motion, a court must accept all factual allegations in the complaint as true.  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  To survive a motion to dismiss, a complaint must contain "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible if the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged," and if there is "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

III.  ANALYSIS.

A.  Sovereign Immunity.

Because the Housing Authority contends that certain of Deedrich's claims are barred by sovereign immunity, an issue touching the court's jurisdiction, I begin by addressing the relevant sovereign immunity frameworks of those claims.

Sovereign immunity under the Eleventh Amendment "deprives federal courts of jurisdiction to hear claims, and a court finding that a party is entitled to sovereign immunity must dismiss the action for lack of subject-matter jurisdiction." *Cunningham v. Gen. Dynamics Info. Tech.*, Inc., 888 F.3d 640, 649 (4th Cir. 2018) (internal quotation marks and citation omitted). This immunity extends to states, as well as state agents and instrumentalities, known as "arm[s] of the state." *Cash v. Granville Cnty. Bd. of Educ.*, 242 F.3d 219, 222 (4th Cir. 2001).

In determining whether an entity is an arm of the state and entitled to Eleventh Amendment immunity, courts consider four factors: (1) whether a judgment against the entity would be paid from the state's treasury; (2) the degree of control the state exercises over the entity; (3) whether the entity is concerned with local or statewide concerns; and (4) how state law treats the entity. *Id*. at 224.

Under Virginia law, a local governmental entity in Virginia is generally immune from liability associated with the performance of governmental functions, but not proprietary ones. *Niese v. City of Alexandria*, 564 S.E.2d 127, 132 (Va. 2002). To determine which functions are governmental and which are proprietary, courts consider "whether, in providing such services, the governmental entity is exercising the powers and duties of government conferred by law for the general benefit and well-being of its citizens." *Massenburg ex rel. Massenburg v. City of Petersburg*, 836 S.E.2d 391, 395 (Va. 2019) (internal quotation marks and citations omitted). In addition, a statutory cause of action is barred unless there is an express statutory provision abrogating sovereign immunity. *Williams v. Commonwealth*, 912 S.E.2d 462, 467 (Va. 2025).

### B. Count I: False Claims Act Retaliation.

Deedrich brings a claim under the federal False Claims Act (FCA), alleging that the Housing Authority retaliated against her after she investigated and reported what she believed to be evidence of a fraudulent payment. The Housing Authority asserts that sovereign immunity bars this claim.

Because this is a claim under federal law, the relevant analysis is whether the Housing Authority is so connected to the Commonwealth of Virginia such that it is an arm of the state. Here, the Housing Authority accepts federal funds for its affordable housing initiatives. It operates with a Board appointed by local

government entities and concerns itself with local housing matters. The Housing Authority's Board also maintains control over its projects. It operates as an owner and manager of housing units, much like private entities in the housing market. Accordingly, I find that the Housing Authority is not sufficiently connected in its operations to the state's concerns to enjoy sovereign immunity. I will therefore turn to the facts alleged in Deedrich's claim under the FCA.

The FCA imposes civil liability on anyone who retaliates against an employee for "lawful acts done by the employee . . . in furtherance of an action under [the FCA] or other efforts to stop 1 or more violations of [the FCA]." 31 U.S.C. § 3730(h)(1). To establish a prima facie case of FCA retaliation, it must be alleged that (1) the employee engaged in a protected activity; (2) the employer knew about the protected activity; and (3) the employer retaliated against the employee in response. *Carlson v. DynCorp Int'l, LLC*, 657 F. App'x 168, 170 (4th Cir. 2016) (unpublished). Proving a violation of the FCA is not an element of an FCA retaliation claim. *Id.* at 174.

There are two categories of conduct that constitute protected activities under the FCA. The first type is activity that supports an FCA action. *Id.* at 170. This type of conduct invokes a "distinct possibility" standard, that is, when the conduct "reasonably could lead to a viable FCA action, or when . . . litigation is a reasonable possibility." *Id.* at 171 (internal quotation marks and citations omitted). The second

type of protected activity is that which is part of an effort to stop an FCA violation. *Id.* at 170. This encompasses a much broader array of activity — conduct in which efforts are motivated by an objectively reasonable belief that the employer is violating or will violate the FCA. *United States ex rel. Grant v. United Airlines*, 912 F.3d 190, 201 (4th Cir. 2018).

Under this latter test, "while the plaintiff's actions need not 'lead to a viable FCA action' as required under the distinct possibility standard, they must still have a nexus to an FCA violation." *Id.* at 202. Internal reporting of violations can constitute protected activity, but merely expressing concern about regulatory non-compliance is not enough. *Id.*

Deedrich has properly established a retaliation claim under the FCA because she has alleged that she engaged in a protected activity, that the Housing Authority knew of her activities, and that the Housing Authority retaliated against her in response. Deedrich states that she heard a rumor that a colleague had set up a payment scheme to transfer funds to an undocumented person who was not otherwise eligible to receive compensation. Deedrich took steps to investigate the rumor and confirmed the existence of the entity and the invoice. She also determined that the entity was registered in Isabella Urraco's name. Under these circumstances, a reasonable employee would be suspicious that her colleague was engaging in an FCA violation. Deedrich's decision to report her findings and suspicions to others

in the Housing Authority was likewise part of her effort to prevent what she believed to be an FCA violation.

The Housing Authority argues that Deedrich's efforts to investigate and report the payment do not constitute protected activity under the FCA because no FCA violation actually occurred. The Housing Authority contends that a payment made to an LLC in which an undocumented person is a member-owner is legal, and therefore, Deedrich had no basis to believe that the payment was fraudulent. I disagree.

The Housing Authority's argument fails because Deedrich does not need to prove that an FCA violation occurred to be successful in a retaliation claim. As discussed above, she need only show an objectively reasonable belief that a violation occurred. Thus, whether the payment scheme at issue technically circumvents the FCA is not dispositive of Deedrich's claim. Further, Deedrich is not required to anticipate all legal defenses to suspicious behavior for her activities to warrant protection under the FCA.

Finally, Deedrich alleges that after she informed the Housing Authority's counsel and board of Katya's payment, she was constructively discharged from her position as Housing Authority director. In the absence of a formal discharge, constructive discharge can occur if an employee is "subjected to circumstances so intolerable that a reasonable person would resign." *U.S. Equal Emp. Opportunity*

*Comm'n v. Consol Energy, Inc.*, 860 F.3d 131, 144–45 (4th Cir. 2017) (internal quotation marks and citation omitted). Working conditions that are merely "difficult or unpleasant" are not sufficient. *Williams v. Giant Food Inc.*, 370 F.3d 423, 434 (4th Cir. 2004) (internal quotation marks and citation omitted).

Deedrich claims that the Housing Authority's conduct caused her loss of income, loss of professional standing and reputation, and emotional distress producing "restless sleep, hair loss, a stomach ulcer, increased blood pressure, and complications with a pre-existing medical condition." Compl. ¶ 103, ECF No. 1. She states that she was pressured to sign a performance improvement plan and received information that Board members were planning to fire her when an email was accidentally forwarded to her stating that her recent action was "the last straw." *Id.* at Ex. 3, ECF No. 1-3. Throughout this time, the Housing Authority did not implement the terms of Deedrich's alleged new contract, despite the agreement Deedrich believed they had made. Collectively, this conduct could create intolerable working conditions that would lead a reasonable person to resign. Accordingly, Deedrich's allegations sufficiently state a claim for retaliation under the FCA.

C. Count II: Virginia Anti-Retaliation Statute.

Deedrich claims that the Housing Authority retaliated against her in violation of Virginia's anti-retaliation statute. Section 40.1-27.3 of the Virginia Code prohibits employers from retaliating against employees who participate in certain

protected conduct. This provision prohibits an employer from retaliating against an "employee [who] in good faith reports a violation of any federal or state law or regulation to a supervisor or to any governmental body or law-enforcement official." Va. Code Ann. § 40.1-27.3(A)(1).

The Housing Authority asserts that it is shielded from liability under the statute because the Virginia General Assembly did not explicitly waive sovereign immunity for entities such as the Housing Authority. Specifically, the Housing Authority alleges that the statute does not apply to Deedrich's claim because the Housing Authority is not included in the statute's definition of an "employer." The Housing Authority notes that other provisions of Title 40.1 include the Commonwealth of Virginia within the meaning of employer, but only with respect to those sections. Because Virginia's anti-retaliation statute does not contemplate entities like the Housing Authority within its definition of "employer," the Housing Authority's Motion to Dismiss as to Count II will be granted. *Wood v. Bristol Va. Util. Bd.,* 1:22CV00018, 2023 WL 7921252, at *2 (W.D. Va. Nov. 16, 2023)

### D. Count III: Breach of Contract.

Deedrich alleges that she entered into a contract with the Housing Authority for a salary increase and employment extension and that the Housing Authority breached the contract when it did not implement the raise or extension. The Housing Authority does not contend that sovereign immunity bars this claim. *See Montalla,*

*LLC v. Commonwealth*, 900 S.E.2d 290, 297 (Va. 2024) ("Virginia has never extended the defense of sovereign immunity to actions based upon valid contracts entered into by duly authorized agents of the government.") (citation and alterations omitted).

Virginia law governs the breach of contract alleged here. Under Virginia law, the elements of a breach of contract claim are: "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Navar, Inc. v. Fed. Bus. Council*, 784 S.E.2d 296, 299 (Va. 2016) (internal quotation marks and citations omitted).

"A contract will be enforced if its obligations are reasonably certain." *R.K. Chevrolet, Inc. v. Hayden*, 480 S.E.2d 477, 480 (Va. 1997). "Even if some terms of a contract are uncertain, it may be read in the light of the surrounding circumstances, and, if from such reading, its meaning may be determined, the contract will be enforced." *Id.* "Further, when the entire agreement has not been reduced to writing, parol evidence is admissible, not to vary or contradict the terms of the written instrument, but to show other facts agreed upon in order to establish the parties' entire contract." *Id.*

Deedrich alleges that in a closed session meeting, the Board of Commissioners agreed to her proposed wage increase and contract extension and

told her it would take effect the following week. Deedrich also claims that she emailed the Board the day after the meeting to thank them for approving her raise. The Housing Authority argues that no contract existed, because it did not agree to the new terms of Deedrich's employment in an open meeting. The Housing Authority cites Va. Code Ann. § 2.2-3711(B), which states that "[n]o resolution, ordinance, rule, contract, regulation, or motion adopted, passed, or agreed to in a closed meeting shall become effective unless the public body, following the meeting, reconvenes in open meeting and takes a vote." Thus, the Housing Authority contends that it was not in breach of any valid agreement when it failed to implement the alleged terms.

While the procedures required to create a valid contract may affect the ultimate success of Deedrich's breach of contract claim, the pleading standard at the motion to dismiss stage does not require that the plaintiff plead every fact she would need to prove at trial. Deedrich's allegations that she met with the Board, which approved her requested terms, are sufficient to support the existence of a contract and survive a motion to dismiss. Accordingly, the present motion as to Count III will be denied.

E. Count IV: Virginia Wage Payment Act.

Deedrich alleges that the Housing Authority owes her damages under the Virginia Wage Payment Act for her unused days of paid leave, for which she was

– 13 –

not compensated. The Virginia Wage Payment Act provides that "[u]pon termination of employment an employee shall be paid all wages or salaries due him for work performed prior thereto; such payment shall be made on or before the date on which he would have been paid for such work had his employment not been terminated." Va. Code Ann. § 40.1-29(A).

Like the anti-retaliation statute discussed in Count II, the Virginia Wage Payment Act applies to an "employer." Also like the anti-retaliation statute, the Virginia Wage Payment Act does not contain the abrogation of state sovereign immunity found in other provisions of the Virginia Code. Thus, state sovereign immunity applies here.

### F. Count V: *Bowman* Claim.

Deedrich brings a *Bowman* claim, alleging wrongful discharge in violation of public policy. Specifically, Deedrich alleges that she was constructively discharged due to the Housing Authority's actions. "An employee is considered constructively discharged if an employer deliberately makes the working conditions intolerable in an effort to induce the employee to quit." *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 425 (4th Cir. 2014) (internal quotation marks and citations omitted). The Housing Authority contends that this claim ought to be dismissed because constructive discharge is not sufficient to make out a wrongful discharge claim under *Bowman*. Def.'s Reply Br. Supp. 15, ECF No. 11.

In *Bowman v. State Bank of Keysville*, the Virginia Supreme Court recognized a common law wrongful discharge claim for the termination of an employee in violation of a Virginia public policy expressed in a Virginia statute. 331 S.E.2d 797, 801 (Va. 1985). However, neither the Supreme Court of Virginia nor the Fourth Circuit has ruled on whether constructive discharge suffices as a form of wrongful discharge in a *Bowman* claim. In addition, district judges within Virginia are split on the issue. *Compare Gordon v. ArmorGroup N.A.*, No. 1:10CV002 (JCC), 2010 WL 3418219, at *4 (E.D. Va. Aug. 27, 2010) (rejecting constructive discharge in *Bowman* claim), *with Watson v. Paramont Mfg., L.L.C,* No. 1:05CV00080, 2006 WL 2995196, at *4 (W.D. Va. Oct. 18, 2006) (recognizing constructive discharge). However, I have recognized constructive discharge as a form of wrongful discharge and I will do so here. *Faulkner v. Dillon*, 92 F. Supp. 3d 493, 499 (W.D. Va. 2015) ("I conclude that courts recognizing constructive discharge under Virginia law are more persuasive regarding the potential approach of the Supreme Court of Virginia.") Thus, wrongful discharge encompasses working conditions that rise to the level of intolerability such that an employee must leave her position.

In this case, as discussed above, Deedrich alleges a series of particularized actions by the Housing Authority that reasonably created an intolerable work environment and led her to fear that her termination was imminent. This satisfies the requirement for pleading a wrongful discharge claim under *Bowman*.

G. Punitive Damages.

The Housing Authority's Motion to Dismiss also requests a dismissal of Deedrich's claims for punitive damages.  Punitive damages are available under Virginia common law where the defendant shows a reckless or callous indifference to the federally protected rights of others, *Smith v. Wade*, 461 U.S. 30, 56 (1983), or engages in actions that are prompted by ill will, malevolence, grudge, spite, wicked intention, or the conscious disregard for the rights of another, *Lee v. Southland Corp.*, 244 S.E.2d 756, 759 (Va. 1978).

Although I have dismissed claims for punitive damages at the motion to dismiss stage, *Riley v. Barringer*, 337 F. Supp. 3d 647, 656 (W.D. Va. 2018) (involving a contract claim and noting that "punitive damages generally are not allowed for breach of contract claims"), where such damages are theoretically recoverable under the applicable law, I find that a motion to dismiss is "a premature means to attack a request for punitive damages."  *Debord v. Grasham*, No. 1:14CV00039, 2014 WL 3734320, at *1 (W.D. Va. July 28, 2014).  Though punitive damages may not be available in a § 1983 action against a local government entity, *Dumas v. Chi. Hous. Auth.*, 930 F. Supp. 1238, 1240 (N.D. Ill. 1996) (citing *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981), they may be available under the existing Virginia *Bowman* claim.  *Frank v. True Color Painters, L.L.C.*, CL

2021-7835, 2021 WL 8315693, at 1 (Va. Cir. Ct. Oct. 4, 2021) (allowing punitive damages in a *Bowman* claim).

Accordingly, I will not dismiss the claim for punitive damages, at least at this stage of the litigation.

IV.   CONCLUSION.

For the foregoing reasons, the Housing Authority's Motion to Dismiss, ECF No. 6, is GRANTED in part and DENIED in part. Deedrich's claims for retaliation under the False Claims Act (Count I), breach of contract (Count III), and wrongful discharge under *Bowman* (Count V) remain. Her claims brought under the Virginia anti-retaliation statute (Count II) and the Virginia Wage Payment Act (Count IV) are DISMISSED.

It is so **ORDERED**.

ENTER:   April 30, 2025

/s/  JAMES P. JONES
Senior United States District Judge